1. It was not error to admit the opinion evidence of the expert and nonexpert witnesses; and the jury was authorized to find that the fatal injuries of the deceased were inflicted upon him by the defendant in Coweta County.
2. The remark of the trial judge upon which error is assigned did not amount to an expression as to what had, or had not, been proved.
3. No injury is shown to the defendant by the incomplete grounds of the amended motion for new trial which complain of the admission in evidence of certain photographs.
4. The exception to the admission of the evidence complained of in ground 11 of the amended motion for new trial is without merit.
5. The evidence amply supported the verdict.
 No. 16450. JANUARY 11, 1949.
John Wallace and others were indicted by the grand jury of Coweta County, charging them with the murder of William H. Turner, alias Wilson Turner, by striking and beating him with a pump shotgun, and by beating and striking him with a blunt instrument unknown to the grand jury, thereby inflicting wounds upon him, from which he died. On the trial of the case of the State against John Wallace, the jury returned a verdict of guilty without a recommendation of mercy. A motion for new trial was made, which was later amended, and the exception here is to the overruling of the motion for new trial, as amended. *Page 677 
The evidence material to a consideration of the questions here involved was as follows: Steve Smith testified for the State: "I live at Moreland at the forks of 41 and 29. 29 goes toward LaGrange and 41 goes toward Greenville. On the morning of April 20th, 1948, I was at the Sunset Tourist Camp there. A '49 Ford, a green pick-up truck, shot in there right fast. You could not help noticing it the way it come in there, and then a '47 green Ford two-door right in with it, and the man in the truck jumped out and run in the front door hollering for help, and the man in the car running up behind him caught him in my front door. He run over there to the door, and the boy hollering for help, and commenced to beating him and knocked him and dragging him back around to the front there around to the side door, and I went over to the side door and walked out, and they were handling him so roughly I said to them, I said, `Why don't you handcuff that boy?' The fellow they called Sivell said, `We don't need to handcuff him,' said `This man is dangerous; he is wanted for murder,' and he was trying to put him in the car, and he braced himself against the car pretty good there, and one they called John Wallace, he hauled off with a shotgun and hit him across the head just as hard as he could hit him, and the boy was hollering for help until he hit him, and when he hit him he fell into the car. Wallace crawled in the foot on top of him still beating him. . . Wallace come up with the gun and hit him; and when he hit him the boy fell in the car, and they got him by the feet and turned him on in the car, and Wallace crawled in the car on top of him, hit him on the head. He come up with the gun and went down with it, and when he hit him the boy fell. He brought it over with both hands. The gun went off when he hit him. What I heard, I didn't hear any rattle in the gun, because you would not hear it, the blow and rattle together, because I heard the gun go off. Turner was braced one hand against the door, and one on the side of the car braced like that. He stooped some. If he had been stooped too much, the gun would have hit the automobile. The gun didn't strike the car at all. The full force of that blow come on the back of his head. Now when he left there the defendant was down on top of him, in the foot still beating him. I could not tell what he had in his hand. It looked like he had *Page 678 
something in his hand, but I could not tell what it was. I don't know whether it was a piece of wood or iron or what it was, but he had something in his hand still beating him. After he hit him with the gun, he fell in the car and they both got him by the heels and pushed him on back in the foot of the car. His legs were limber. He never did say nothing else. I do not know the man that was hit with that gun. This is a photograph of the man that was hit with the gun there at that time. He was not dressed like that. He was a little fellow, looked like he would weigh 125 or 130 pounds, a weaselly looking man. He came to the front door of my business. He was not saying nothing until Wallace grabbed him, then he hollered for help — `Get some help quick, they are going to kill me.' He was hollering as loud as he could holler. He hollered up until the time he was hit with the gun."
The witness was asked the question: "Now, Mr. Smith, from what you saw there, the force of that blow and the conduct of this man, after he was hit, state whether or not in your opinion that blow was sufficient to produce death." Over objections, the witness replied, "Yes, sir." Over objections, the further questions and answers were allowed: "[Q.] I will ask you from having observed the force of the blow, the conduct of the man after he was struck, the weapon with which he was struck, and from the size of the weapon, the force of the blow and the conduct of the man after he was struck, the size of the man who struck him with the gun, and the size of the man who was hit, I will ask you in your opinion whether or not after he was hit with that gun this man who was hit was dead or alive. [A.] I would say he was dead. [Q.] I will ask you, Mr. Smith, from the force of that blow, the kind of weapon that was used, the conduct of the man before and after he was struck, the size of the man who struck him, and the force with which he struck him, to state whether or not in your opinion that blow that struck him back of his head was or was not a mortal wound sufficient to cause death, and did cause death. [A.] I would say it was hard enough to kill him. [Q.] And in your opinion did it kill him? [A.] Yes, sir." The witness testified further: "My place of business is located in Coweta County. I saw Mr. Turner struck with this pump shotgun in Coweta County. From *Page 679 
my place down to Meriwether is about five miles I guess."
Dr. C. C. Elliott, physician, after evidence to qualify him as an expert witness, testified: "If a man that size were to take a pump shotgun, made in this manner, and struck a man that weighed from 125 to 130 pounds in the back of the head with all of his force that he could apply to that stroke in my opinion, a blow like that might produce death. It might produce instant death and it also might not."
Dr. J. D. Tribble, physician, after qualifying as an expert witness, testified: "If a man that size would take a pump gun and strike a man across the base of the brain or the back of his head with all the force he could apply to the blow in my opinion such a blow could cause his death. The result of it would depend somewhat upon the area injured, upon the severity of the blow, upon the physical stamina of the man stricken."
Dr. George Kinnard, physician, qualified as an expert, testified: "If a man the size of the defendant on trial here should take a gun similar to this and hit a man across the back of the head with both hands and all the force he could apply to the blow, I would say that blow would cause death in all ordinary circumstances."
Mrs. Merle Hannah, a witness for the State, testified: "Around 12:30 on Tuesday this pick-up truck came up from toward Greenville, and this car following it. Both came at high speed, and the truck swerved and turned in at the Sunset, and parked at the north side of the building, and the car swerved and they come in almost bumper to bumper, the car and truck, and the truck stopped and the driver of it jumped from the truck and ran under the shelter, and he made an attempt to open the front door of the building there, but he missed the door, and he was reaching for the screen. In the meantime, two men jumped from the Ford, this car, and Wallace had a shotgun, and he raised the gun as if he was going to shoot the man, and in the excitement I told him not to kill him, and he told me — he signaled like that — to hush, and as he did that, he run under the shelter and grabbed him before he opened the door, and they scuffled with him and began to beat him until they got him almost to the car, and when they got out, the door of the car was open, and he kind of backed back and pushed back as if *Page 680 
he didn't want to get in the car, and this Wallace drew back with a shotgun and struck him across the head, looked like full force, and as he did that the gun went off, and at that time Turner slumped like he — he had hollered once before, `Don't let them kill me,' but when they struck him he didn't holler any more. When he slumped forward, they picked him up and shoved him in the back of the car between the front and back seat in the foot, but his feet were out, and this old man Sivell shoved his feet in so they close the door. Wallace crawled in on him, still in the motion of beating him, and closed the door, and Sivell drove off. He drove the car up there. They went around the building and went back the way they came, and him down in the foot of the car on top of Turner. . . Sivell was driving and Wallace riding on the front with him. Sivell ran with Wallace to catch him at the door, and he helped shove him, and kind of beating on him trying to get him in the car, and he resisted, and both had ahold of him. The defendant left there beating him in the back of the car, you could not see his hand and what he had in his hand. You could just see the top of his head as the car drove off. Wallace's head. You could not see Turner, and he was in the motion as if he was still beating him, but I could not say what he had. He was beating him when he left."
Questions submitted by the solicitor-general, and replies by Mrs. Hannah, were as follows: "[Q.] What happened to Turner when they hit him in the back of the head with the gun? [A.] He slumped over, dropped forward. [Q.] Had he been saying anything prior to that time? [A.] He hollered, `don't let them kill me,' after I hollered `Don't kill him,' and they grabbed him, and he yelled, `Don't let them kill me.' [Q.] Did he ever say anything after they hit him with the gun? [A.] No, sir. [Q.] After Wallace hit him? [A.] No, sir. [Q.] Did he ever move any more that you could tell? [A.] No sir, he did not. [Q.] I will ask you, Mrs. Hannah, from what you saw, the condition of the man before he was struck, and the force of the blow with which he was struck, and after he was struck, state whether or not in your opinion that would cause his death. [A. (Over objections)] In my opinion, he was dead when he left Sunset." On cross-examination, the witness testified that she was standing beside the highway, on the opposite side from the Sunset Inn. *Page 681 
Robert Lee Gates testified for the State: On April 20, 1948, he was living on the defendant's place. On Wednesday night, April 21, the defendant came to the witness's home. The defendant was in a pick-up truck, and Albert Brooks was with him. They had cordwood and gas on the truck. The defendant told the witness to get his hat, that he wanted the witness to help him a little bit. They drove down by the swamp and threw the wood off and set the gas off, and came back to the defendant's house, and he told them to saddle horses. Brooks was told to meet them at the pasture fence on the Gates place at the gap, and they came through the swamp. Brooks reached the appointed meeting place first. They tied the horses there, and the defendant told them that he had a package that was hidden over there which he had to find, that it was in a thick place with some bushes around it, in a well. After considerable search they did not find the well, and at three o'clock in the morning the defendant abandoned the search until later. At around eight o'clock on Thursday morning they began the search again. By inquiry of Wilson Woodward they learned the location of another well, and the defendant decided that this was the well he was attempting to locate. The witness then stated: "I seed some blood around the well there. I saw a pole across that well. The pole had some blood on it. He [defendant] told us all right, said, `You go get the rope and the well drags and let's get the package out of here.' He carried the grabs over there that night. And I went and got the ropes and come back, and let the rope down in there, let the drag down in there, and I hung the grab on his shoe, on the man's shoe that was in the well. Mr. Wallace taken the rope and throwed it around like that until he got it around his leg, and said, `Let's pull it out,' and we pulled it out, and when he got it on top of the ground he says, `Wrap the package up,' and we taken it and wrapped it up. When we got the package up to the top it was a man, Mr. Wilson Turner. I have been knowing Mr. Wilson Turner around two years. The back of his head looked like it might have been knocked off. I would not say it was crushed in. I didn't look back there hard. I just seed it was knocked off. After we got Mr. Turner out of the well, we wrapped it." The witness further testified: The defendant directed him to cut a pole, on which they carried the *Page 682 
body for about one-half of a mile, then they laid it down and cut some brush and put over it. The defendant directed the witness to drive the truck back to the defendant's home and to bring the two horses they had the night before. He returned with the horses around eleven o'clock, and they tied the body on one of the horses, and brought it near the place where they had placed the wood on Wednesday night. They cut brush and put it over the body, and left it there until late that afternoon, when the defendant directed them to meet him. He told them to carry the wood to a pit, and when they had placed most of the wood in the pit, the defendant directed them to get the package and place it on the wood. They then poured ten gallons of gasoline on the body. The blaze went up to the top of some high trees there. They stayed there for about thirty minutes, and then went home. The defendant told them to go there the first thing in the morning, take shovel and sacks, and clean the pit. The next morning (Friday), the witness and Brooks shoveled up the ashes and put them in the sacks, and they, and the defendant, took the ashes down to the creek and poured them in the creek.
Albert Brooks, a witness for the State, gave substantially the same account of the search for, and disposal of, the body of Turner. In regard to the injuries on the body when it was drawn from the well, he stated: "When the body was taken out of the well all the injuries I seed was just about his head. It was knocked off back here."
The defendant made a lengthy statement to the jury. He stated to them that he had served a short sentence in the Federal penitentiary in Atlanta on a liquor violation in 1929, and in 1935 was again tried on a liquor charge, and served a short sentence. He told of allowing the deceased to become one of his tenants, although he was hesitant to do this, since Turner was a white man, and all of his other tenants were colored. He related a long course of dealing with the deceased, in which the defendant was much distressed by the manufacture of illicit liquor on his place by the deceased. He gave an account of an incident when he informed Federal officers that Turner was manufacturing illicit liquor, and the deceased was fined. He stated further that: He again heard that Turner was operating *Page 683 
an illicit distillery, and he did not like the way Turner was influencing his colored tenants, and he finally went to Turner's home and told him that he would have to leave his place. After this he heard of threats against his life that Turner had made. He was distressed by the fact that Turner was still making liquor, and obtained the services of Federal officers to investigate the matter, but no arrests were made. During the winter months, a number of the defendant's cows disappeared, and the neighbors told him that the deceased had gotten them. Later, three of his pure-bred cows, of the value of $1605, disappeared, and there was evidence that some one had taken them. With the assistance of friends, stock auctions in several cities were checked, and he notified the Georgia Bureau of Investigation of the loss of his cows. Finally one of the cows was located in a lot in Carrollton. The defendant decided to keep a watch on the cow every night in an effort to catch the person who had stolen her. He watched the cow for several nights, during which time he had very little sleep. On Sunday night the officers in Carrollton arrested Turner, and told the defendant that Turner had admitted stealing his cows. Turner was placed in jail in Carrollton. After trying unsuccessfully to locate the other cows at a place the officers said that Turner told them the cows could be found, the defendant came back to Carrollton and told the sheriff that he would be in his office the next morning. The sheriff told him that he did not think he could do anything more for him, that he was surprised that Turner had talked as much as he had, and he did not think he would talk any more. The defendant then called the Sheriff of Meriwether County (the residence of the defendant being in Meriwether), and told the sheriff that he had located one of his cows, and had located the man who had confessed to getting the cow, and asked that he get a warrant and come after the man. When they went to the jail, Turner asked the defendant to sign a bond for him, which the defendant refused to do. Turner denied at that time that he knew anything about the cows. They took Turner to the Meriwether County jail, and the defendant went home. The next day (Tuesday) the Sheriff of Meriwether County came to his home and told him that he had talked with the solicitor-general, and that the solicitor said that it was a weak case, and it did not appear to him that they *Page 684 
could place Turner within Meriwether County with the cows, and the thing to do was to prosecute him in Carroll County. His previous experience with the Sheriff of Carroll County made him most discouraged to think that he would have to go back there and prosecute the case in that county. He told the sheriff that he would come to see him the next morning to decide what to do about Turner. The next morning, with three friends (later indicted with Wallace for the murder of Turner), he went to Greenville. The defendant had a shotgun in the car in which he rode. He wanted to talk to Turner, but did not mean to talk to him in jail. When he reached the jail, he found that Turner had been released. When he returned to the car of his friend, he saw a truck resembling the one that Turner owned, and he recognized Turner. The defendant got in the car and told his friend to pull on over the hill, and told him that Turner was right behind them. About that time Turner passed them, and they pursued him until they reached the Sunset Tourist Camp. Turner got out of his truck and attempted to enter the cafe. The defendant got out in pursuit of Turner, with a shotgun in one hand and the other hand empty. When Turner reached the door the defendant caught hold of him with his left hand, the hand that had the shotgun in it. He attempted to take Turner back to the car, with the strength of his right hand shoving him toward the car. When he reached the car with Turner, he shoved him in the car. "In pushing Turner in this car the barrel of this gun at some time in shoving him with the hand that had this shotgun in it, struck his ear, and on his ear it broke the skin where it joins into the head," and the place bled, but not profusely. When he pushed Turner in the car, the barrel of the gun was higher than the top of the door of the car, and when it hit the top of the car the gun fired. He did not hit Turner with the gun when it fired. Turner was not injured except when he struck him with the gun, more or less accidentally, in putting him in the car. The defendant got in the car with him and put his hand over Turner's mouth to "stop his hollering." Turner was not limp when they put him in the car, the only wound was the cut given him with the shotgun. They drove off from the filling station, and the defendant held Turner in the foot of the car. When they had gone about a mile they met his two other friends in *Page 685 
the other car. They pulled off of the road, and found that the car in which the defendant was riding had a flat tire, and transferred to the other car. Turner got out of the first car, and into the second, under his own power. Turner talked as they were riding and smoked several cigarettes. He was then sitting up in the car. The defendant took Turner to the place where his first cattle were lost. His purpose in this was to try to get a confession from Turner, and to get him to tell where the cattle were. When the defendant got out of the car, he took a shotgun out with him. It was not the same gun that he had at the tourist camp, and he did not know whose it was. The defendant was not far from his home. He told the driver of the car to leave them there, and he and one friend proceeded with Turner into a pine woods, and came to a place where there was an old well. When they reached the well, the defendant walked around it and looked in the well, and looked at Turner. At this point Turner said, "Mr. John, put me in that well and let me stay two or three hours and let me out of there, and I will go back and move back down here, and help you find your cows." The defendant walked around within about five feet of Turner, and at that time somebody in the direction of the railroad not far from there "hollered." The defendant turned his head in the direction of the noise, took his gun that was in his right hand and laid it in the bend of his left arm, and at that instant the gun fired. When the gun fired, the defendant looked around at Turner and he was lying full length on the ground with the top of his scalp torn off. He did not fire the gun wilfully. The defendant does not remember anything that happened for several days after that time. The place where the accident happened was in Meriwether County.
1. In ground 1 of the amended motion for new trial, it is contended that "a material allegation contained in the indictment, to wit, that the crime charged against the defendant, John Wallace, was committed in the County of Coweta, was not shown by competent evidence, or evidence of probative value, to *Page 686 
have been committed in Coweta County." It is contended that the State depended solely upon the testimony of the nonexpert witnesses, Steve Smith and Mrs. Merle Hannah, to establish that the crime was committed in Coweta County, as charged in the indictment. It is urged that, proof of venue being a material and controlling allegation in the indictment, it can not be established solely by opinion evidence of nonexperts, and that the verdict and judgment are therefore contrary to law, contrary to evidence, contrary to the overwhelming weight of the evidence, and without supporting evidence. The testimony of the nonexpert witnesses, Steve Smith and Mrs. Merle Hannah, together with the testimony of the three physicians, Dr. C. C. Elliott, Dr. George Kinnard, and Dr. J. D. Tribble, is fully set out and made a part of this ground.
In ground 2, error is assigned on the admission in evidence of the opinion of the witness, Steve Smith, that the blow inflicted upon the deceased by the defendant, as observed by the witness Smith, was sufficient to produce death.
In ground 3, error is assigned on the admission in evidence, over objection, of the testimony of the witness, Steve Smith, on cross-examination by the defendant's counsel, the question and answer being as follows: "[Q.] This is the first time you ever saw a man hit that hard, is it not? [A.] The first time I have ever seen one hit hard enough to kill him." It is contended that the answer of the witness was not responsive to the question, was a voluntary statement of the witness's conclusion, that the witness had detailed no facts or circumstances from which the jury could not reach a proper conclusion independently of the opinion of the witness, and that the evidence was harmful and prejudicial.
Grounds 4, 5, and 6 assign error on the admission in evidence of the testimony of the three physicians, Doctors Elliott, Kinnard, and Tribble, on the grounds that there was no basis for the witnesses' opinions, that it permitted an expert witness to predicate an opinion upon a hypothetical question which posed no premise, and that there was no basis upon which the witness could intelligently appraise the force of the alleged blow.
In ground 7, error is assigned on the admission in evidence, over objections, of the testimony of Mrs. Merle Hannah, in response *Page 687 
to the following question: "I will ask you, Mrs. Hannah, from what you saw, the condition of the man before he was struck, and the force of the blow with which he was struck, and after he was struck, state whether in your opinion that would cause his death." The response of the witness was: "In my opinion he was dead when he left Sunset." Counsel objected to the answer on the ground that it stated a conclusion, the witness had not qualified as an expert, the witness had detailed no facts or circumstances that could not be known and considered by the jury, the evidence objected to was material and controlling on an essential allegation contained in the indictment, was harmful and prejudicial, etc.
Ground 1 having attacked the sufficiency of the evidence relied upon by the State to prove the venue of the crime in Coweta County, and the following six grounds constituting assignments of error on the admission of the evidence relied upon to establish venue, these seven grounds are so closely related and connected that they may be considered together.
The first question for determination is whether or not the opinion evidence given by the nonexpert witnesses, Steve Smith and Mrs. Merle Hannah, would be admissible.
Except in those instances where the question to be determined is one of opinion, nonexpert witnesses may not as a general rule testify as to their opinions on the matter under investigation. There is an exception to this general rule. American Jurisprudence (Vol. 20, p. 640, § 769) states this exception as follows: "From very necessity testimony must occasionally be compounded of fact and opinion, so that exceptions and limitations upon the general rule that witnesses must testify to facts, and not opinions, have been found to be necessary to the due administration of justice; for example, expert witnesses who have skill, learning, or experience in a particular science, art, or trade may give an opinion in a proper case upon a given state of facts relating thereto. Exceptions to the rule that witnesses cannot give opinions are not confined to the evidence of experts testifying upon subjects requiring special knowledge, skill, or learning. It has also been found necessary to admit a class ofevidence from nonexpert witnesses, which is usually spoken of as`opinion evidence,' where the facts as they appeared to thewitness cannot clearly *Page 688 and adequately be reproduced, described and detailed to thejury." (Italics ours.)
The "necessity rule" has long been recognized and applied by the courts of this State. In Taylor v. State, 135 Ga. 622
(6) (70 S.E. 237), it was held: "Where a witness has observed a matter in issue and from the nature of the circumstances he can not adequately state or recite the data so fully and accurately as to put the jury completely in the witness's place and enable them to equally well draw the inference, it is allowable for the witness to give his inference in connection with the facts upon which it is predicated; but if the data can be placed before the jury in such a way that they may draw the inference as well as the witness, then it would be superfluous to add by way of testimony the inference which the jury may well draw for themselves."
The rule stated in Taylor v. State, supra, was followed inShiver v. Tift, 143 Ga. 795 (85 S.E. 1031, L.R.A. 1918 A, 622), where the rule was restated in the following language: "Opinions of witnesses not experts are sometimes admissible from necessity, and to prevent a failure of justice, as in questions of identity of persons, handwriting, distances, size, sounds, and the like. If the facts upon which the opinion is formed can be as well stated and described, they must be, and the jury left to form their own opinion; but where the subject-matter of the inquiry is such as can not be adequately described so as to enable the jury to form an opinion of their own, opinion testimony is permissible."
The two nonexpert witnesses in this case could not in any accurate view so describe the assault on the deceased as to place the jury in the witness's place. Words and gestures could not adequately convey to the jury the variety of circumstances of the assault, with the same force and clearness as they appeared to the witness. The impressions of the witness as to the seriousness of the assault on the deceased may have been based in part on inferences that only the witness could draw from details incapable of communication to the jury. Under the necessity rule, it was not error for the court to permit the jury to consider, along with the facts testified to by them, the opinions of the witnesses as to the seriousness of the injuries inflicted upon the deceased by the defendant in Coweta County. See Lanier v.State, 141 Ga. 19 (3) (80 S.E. 5); Tanner v. State,163 Ga. 126 (7) (135 S.E. 917); Barron v. Chamblee, 199 Ga. 591
(34 S.E.2d 828). *Page 689 
The Code, § 38-1710, provides: "The opinions of experts, on any question of science, skill, trade, or like questions, shall always be admissible; and such opinions may be given on the facts as proved by other witnesses."
In Central Railroad v. Senn, 73 Ga. 711, it was held: "An expert may give his opinion without stating the reasons therefor, but one who is not an expert may give his opinion, accompanied with the reasons. It is a very general rule that, wherever an expert can give an opinion without the reasons, that one who is not an expert can give an opinion with the reasons." In Travelers Ins. Co. v. Thornton, 119 Ga. 456
(46 S.E. 678), it was said in part: "A physician could give an opinion on hypothetical facts, on what he had heard other witnesses testify in the case, or on facts discovered by his own investigation."
In this case, the physicians who testified had an opportunity to observe the defendant and form some opinion as to his probable physical strength. They likewise had an opportunity to see the shotgun used by the defendant in striking the deceased over the head, and to form an opinion as to the nature and seriousness of the resulting injury, the nonexpert witnesses having testified that the defendant apparently struck the deceased with all his strength. The facts testified to by the nonexpert witness, coupled with the facts observed by the expert witnesses, formed a proper basis for the hypothetical questions propounded to each of the physicians. No error is shown in the admission of the testimony of the nonexpert or expert witnesses, as attacked by the first seven grounds of the amended motion for new trial.
Having held that the evidence relied upon by the State to prove venue was properly admitted, the sufficiency of the evidence to fix venue in Coweta County must be determined. Admittedly, the deceased was killed by the defendant, and the undisputed evidence shows that the body of the deceased was destroyed by the defendant and his employees. The two employees of the defendant who assisted him in removing the body of the deceased from the well, and in conveying it to the place where it was later destroyed by fire, stated that it looked as if the back of the deceased's head was "knocked off." The evidence of the two nonexpert witnesses as to the force and effect of the blow on the deceased's head is in part, at least, supported by the testimony *Page 690 
of these employees of the defendant. The evidence offered by the State as to the extent and nature of the injuries inflicted upon the deceased by the defendant in Coweta County is not contradicted by any testimony for the defendant. The weight to be given the statement of the defendant was a question solely for the jury, and they, by their verdict, did not accept the version of the defendant, that he accidentally killed the deceased in Meriwether County. The testimony of the nonexpert and expert witnesses was sufficient to authorize the jury to find that the deceased came to his death as a result of the injuries inflicted upon him by the defendant in Coweta County.
2. Ground 8 assigns as error a remark of the trial judge during the cross-examination of the witness, Mrs. Merle Hannah. From this ground it appears that the following occurred: "`[Q.] You testified a while ago that he was going through the motion like he was beating him. [A.] I did say that. [Q.] Then a minute later you swore — changed it and said he was beating him. [A.] I did say that. [Q.] Why did you change it? [A.] You wanted me to, because you can't beat anybody without being in motion.' Whereupon, movant's counsel addressed the court and asked, `Your honor, ask her to answer the question?' To which the court replied: `I think her answer is all right.'" It is contended that the court's ruling amounted to an expression of his opinion as to the weight and sufficiency of the evidence and its probative value; that there was loud applause in the courtroom, which was calculated to adversely influence the jury against the movant; and that the court took cognizance of the demonstration with the following statements: "If that occurs one more time I will have to clear the courtroom. Don't let it happen again. If it does, I will clear the courtroom for the rest of the trial. Go ahead."
The statement of the court, "I think her answer is all right," reasonably construed, could only be interpreted to mean that the trial judge held the answer of the witness to be responsive to the questioning of counsel. It was not an expression of opinion as to what had, or had not been proved, and no injury is shown to the defendant by the remarks of the trial judge. The persons (two or three, as shown by the record) making the demonstration complained of were sufficiently rebuked by the statements of the court *Page 691 
that upon a similar occurrence the courtroom would be cleared. This ground of the amended motion does not require the grant of a new trial. See Brown v. State, 203 Ga. 218
(46 S.E.2d 160).
3. Grounds 9 and 10 complain of the admission in evidence, over objections, of certain photographs, on the grounds that they were not shown to have been made by persons competent and skilled in the operation of a camera in such manner as to bring about a correct result, and the identification of the photographs was insufficient in the absence of proof that they were made by persons skilled in the operation of a camera so as to bring about a correct result. In neither ground is it shown how, or in what manner, the evidence objected to was injurious to the defendant, and the grounds are otherwise incomplete. It was not error to overrule these grounds.
4. In ground 11 of the amended motion for new trial, it is contended that the court erred in admitting in evidence a handkerchief of what purported to be ashes, over the objection that that there was no testimony identifying either the handkerchief or the substance claimed to be ashes, that the chain of custody of the alleged ashes had not been established, the evidence was immaterial, illustrated no issue in the case, and was harmful and prejudicial to the defendant's case.
The uncontradicted evidence of the two witnesses, Robert Lee Gates and Albert Brooks, to the effect that at the instance and request of the defendant they assisted him in burning and destroying the body of the deceased, sufficiently established the fact that the body of the deceased was destroyed by the defendant. The witness for the State testified that the ashes were gathered at a place pointed out by Gates and Brooks, who had testified that the ashes from the pit where the body of the deceased was destroyed by fire were dumped by them in the edge of a stream. The evidence of the State's witness corroborated the testimony of the two witnesses, Gates and Brooks, only to the effect that ashes were at the point where they testified the ashes might be found. This ground of the motion for new trial is without merit.
5. The evidence in this case is amply sufficient to support and sustain the verdict.
Judgment affirmed. All the Justices concur. *Page 692